**George J. WEINER and Gladys R. Zutz, Plaintiffs,**

v.

**SELECTIVE WAY INSURANCE COMPANY, a foreign corporation, Defendant.**

**C.A. No. 00C–12–054RRC.**

Superior Court of Delaware.

Submitted: Dec. 21, 2001.
Decided: Jan. 30, 2002.
Revised: March 11, 2002.

Jeffrey M. Weiner, Esquire, Wilmington, Delaware, Attorney for Plaintiffs George J. Weiner and Gladys R. Zutz.

Roger D. Landon, Esquire and Jonathan L. Parshall, Esquire, Murphy Spadaro & Landon, Wilmington, Delaware, Attorneys for Defendant Selective Way Insurance Company.

COOCH, J.

## INTRODUCTION

This is the Court's decision on a request for a declaratory judgment set forth in a complaint filed by George J. Weiner and Gladys R. Zutz ("Plaintiffs") against Selective Way Insurance Company ("Selective"). It is also a ruling on a motion for summary judgment filed by Selective against Plaintiffs.

Plaintiffs are insureds under a commercial property insurance policy ("the Policy") issued by Selective for property located at 216 West Ninth Street in Wilmington, Delaware (the "Property"). Plaintiffs own the Property and lease it to Bottlecaps, Inc., a restaurant and bar.[1] In Count 1 of their complaint, Plaintiffs seek a declaratory judgment that Selective is obligated to provide coverage under the Policy for certain repair expenses they have incurred as owners of the Property. Plaintiffs argue that the Property is in a state of "collapse" covered under the Policy, and that this collapse was caused by "hidden decay". In Count 2, Plaintiffs allege Selective is in breach of contract for denying that the "collapse" of the Policy falls within policy coverage.

In its motion for summary judgment, Selective argues that Plaintiffs' claim is

---

1. Bottlecaps, Inc., the named insured under the Policy, has executed a power of attorney in favor of Plaintiffs, thereby authorizing Plaintiffs to proceed under their own names.

outside of the scope of the Policy and that coverage is therefore unavailable. Selective argues that "collapse" coverage under the Policy exists only when an insured premises is reduced to "rubble" or to "flattened form." Because the Property here is not in rubble or flattened form, Selective contends it owes Plaintiffs no duty of compensation under the policy.

The issue before the Court is whether conditions specified in a report prepared by a structural engineer at Plaintiffs' request satisfy the provisions contained in the Policy for "collapse" coverage to be triggered. The term "collapse" is not defined in the policy itself, so the issue is whether the conditions described in that report constitute "collapse" as a matter of law.

This is not an issue of first impression in Delaware. In 1993, this Court determined that insurance coverage for a building's collapse could exist even where something short of a reduction to rubble has occurred;[2] the Delaware Supreme Court, however, has not yet ruled on this issue. The Court here finds that the Policy potentially provides "collapse" coverage even where the insured property may not be reduced to flattened form or rubble if the property is found at trial nevertheless to be is in a state of serious impairment of structural integrity that connotes imminent collapse threatening preservation of the Property. Plaintiffs however must also produce sufficient evidence at trial which demonstrates that the collapse can be attributed to one of the enumerated causes covered under the terms of the Policy, specifically "hidden decay."[3] Because the Court construes the Policy to provide coverage for less than an "actual" collapse, the Court now issues a declaratory judgment that Plaintiffs may potentially be compensated by Selective for the loss or damage to the Property, subject to Plaintiff's proof at trial. The Court accordingly finds that Selective is not entitled to judgment as a matter of law and its motion for summary judgment is therefore **DENIED.**

## FACTS AND PROCEDURAL HISTORY

The Policy contains a section captioned "Causes of Loss—Special Form". Under the exclusions clause of that section, the form states that:

> 2. [Selective] will not pay for loss or damage caused by or resulting from any of the following:
>
> . . . .
>
> k. Collapse, except as provided below in the Additional Coverage for Collapse. But if Collapse results in a Covered Cause of Loss at the described premises, [Selective] will pay for the loss or

**2.** *Judge v. State Farm Ins. Co.*, Del.Super., C.A. No. 92C–03–010, 1993 WL 1611307 Graves, J. (May 3, 1993) (Letter Op.) (stating that the "majority rule" interpreting "collapse" to include "imminent collapse" was the more suitable interpretation of the term as used in the insurance policy at issue there); *see also Olde Colonial Village Condominium Council v. Millers Mut. Ins. Co.*, Del.Super., C.A. No. 99C–06–187, 2002 WL 122885 Silverman, J. (January 28, 2002) (Mem.Op.) (holding that costs directly attributable to restoration of collapsed building were recoverable by insureds but that costs of maintenance or preventative measures were not recoverable).

**3.** The parties agree, for the purpose of resolving both pending motions, that no material facts are in dispute. However, this opinion as originally issued may have inadvertently suggested that there were no material facts in dispute at all in this litigation. Selective sought clarification after issuance of the opinion, arguing that material facts are potentially in dispute insofar as whether "hidden decay" exists; Plaintiffs and the Court agree. The opinion has accordingly been revised.

damage caused by that Covered Cause of Loss.

The "Additional Coverage for Collapse" provision provides as follows:

1. [Selective] will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:

. . . .

b. Hidden decay.

The Policy does not define "collapse" except as provided in the following single exclusionary sentence contained in the "Additional Coverage for Collapse" section:

4. Collapse does not include settling, cracking, shrinkage, bulging or expansion.

Plaintiffs apparently first noted the structural issues associated with the Property in "late summer or early fall of 1999." [4] In October 1999, at Plaintiffs' request, Daniel Koffler ("Koffler"), a structural engineer affiliated with DPM National Consulting, conducted a walk-through of the Property. Koffler later memorialized his walk-through observations in a report dated March 15, 2000. That report states that the floors in many of the second floor rooms of the Property were "collapsing" and that window and exterior door frames were sloping because of "bulging" masonry walls. In his report, Koffler opined that "hidden decay" of brick used in the Property's original construction was the cause of the "collapsing" and "bulging" that he observed.

The Koffler report contained 35 photographs of various parts of the Property's interior. Each photograph had an accompanying explanation, many of which explanations used language such as "settling," "bulging," and "cracking." Some of the accompanying explanations also used words such as "on verge of collapsing," "not full bearing," and "failure." Based on these observations, Koffler concluded as follows:

The building located at 216 W. Ninth Street has exhibited evidence of hidden decay as seen in the enclosed photographs. Hidden decay is a process of deterioration of construction materials in structures that unbeknownst to the owners develop. Examination of the brick indicates that they are salmon brick made of shale and underburned, highly porous and of poor strength. In addition the brick may have been laid in dry mortar. Even durable materials such as bricks and mortar are subject [to] breakdown. Mortar is porous and will absorb moisture which in turn infiltrates into the bricks and starts the process of decay.

As the mortar and salmon bricks deteriorate from hidden decay they settle and in doing so the structural members that bear on them such as beams, joists and other components settle and deflect. The walls of this structure are in dire need of extensive repair to avoid the continued decay and collapse. As the joists and other structural members bering [sic] on the walls slip away from full bearing, the walls will collapse.

Masonry used in this structure such as examined by this engineer are not permitted for exterior bearing walls. They are inferior of high water absorption and rather poor strength as noted above. As the water deteriorates the mortar and bricks they crack off in slivers mostly under beams and joists.[5]

---

4. Pls.' Answer to Def.'s Interrog. 5.

5. Letter from Koffler to Emory Hill Management Company of 3/15/00, at 4.

Plaintiffs then filed a claim with Selective seeking coverage under the "Additional Coverage for Collapse" clause contained within the Policy. Based on its own investigation, Selective denied Plaintiffs' claim on September 14, 2000, because "the condition [was] not sudden, accidental or hidden." [6] Selective cited the exclusions contained in the "Causes of Loss—Special Form" as the reason for their denial. Specifically, Selective cited the exclusions provisions that state:

2. [Selective] will not pay for loss or damage caused by or resulting from any of the following:

. . . .

d.(1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

. . . .

(4) Settling, cracking, shrinking or expansion;

. . . .

f. Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

. . . .

3. [Selective] will not pay for loss or damage caused by or resulting from any of the following... [b]ut if an excluded cause of loss that is listed...results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

. . . .

c. Faulty, inadequate or defective:

. . . .

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation, or remodeling;

(4) Maintenance

Plaintiffs filed suit in December 2000 following Selective's denial of coverage.[7] The complaint asks for "actual compensatory and consequential damages...including without limitation pre-and post-judgment interest" as well as "reasonable counsel fees pursuant to 18 *Del. C.* § 4102." [8] Plaintiffs represent that, as of September 2001, they had paid approximately $68,000 of an estimated $93,000, the latter figure being the cost of repair quoted to Plaintiffs when they entered into a construction contract in June 2001.

Bottlecaps is apparently still operating as a restaurant and bar.

---

**6.** Letter from Selective to Plaintiffs of 9/14/00, at 1.

**7.** Of interest, but not relevant to the issues raised at this juncture by the parties, is that as part of their investigation of Plaintiffs' claim, Selective employed Russell E. Daniels ("Daniels"), also a structural engineer, to inspect the Property. Daniels concluded in a September 5, 2000 report that the second and third floor "sagging and movement" was due to a "combination of inadequacies in the original framing and the removal of first floor walls over the years" and that the Property had not "collapsed" within the meaning of the Policy. Daniels' conclusions about "collapse," although contrary to Koffler's conclu-

sions, do not compel the Court to decide the present motion in terms of genuine issues of material fact, however, because the Court has found that Selective is not entitled to judgment as a matter of law. The parties agree that no issues of material fact are present for the purposes of this Court's ruling on Plaintiffs' request for a declaratory judgment and Selective's motion for summary judgment.

**8.** 18 *Del. C.* § 4102 provides:

The court upon rendering judgment against any insurer upon any policy of property insurance...shall allow the plaintiff a reasonable sum as attorney's fees to be taxed as part of the costs.

## CONTENTIONS OF THE PARTIES

Plaintiffs ask the Court to issue a declaratory judgment in their favor and also to deny Selective's motion for summary judgment. Plaintiffs argue that coverage under the Policy exists when there is something less than an "actual" collapse; they contend that they have shown "serious impairment of structural integrity" which they claim, as a matter of law, is sufficient to trigger coverage under the Policy. Plaintiffs argue that the trend of modern case law does not require them to wait for the "actual" collapse of the Property, as that would frustrate their understanding of the purposes of their insurance contract, as well as subvert their duty to mitigate damages and avoid economic waste. Plaintiffs argue that Selective is not entitled to summary judgment since there has in fact been a "collapse," *i.e.*, a "serious impairment of structural integrity" under the undisputed facts, thus precluding summary judgment in favor of Selective as a matter of law.

In its motion for summary judgment, Selective contends that for policy coverage to be triggered, there must first be an "actual" collapse of the Property. Selective argues that there has been no such "collapse," as the Property has not been reduced to "a heap of rubble" or a "flattened form"; Selective points out that Bottlecaps has remained open for business throughout this litigation. Selective also argues that the Koffler report "tacitly concedes" that there has been no "collapse," and that the conditions described by Koffler in his report—"settling," "bulging," and "cracking"—are specifically excluded from coverage under the Policy.

Both Plaintiffs and Selective agree that this case is appropriate for an issuance of a declaratory judgment, but disagree as to the scope of the declaratory judgment.

## STANDARD OF REVIEW

■ Delaware's Declaratory Judgment Act [9] provides a means for securing judicial relief in an expeditious and comprehensive manner.[10] The Act is entitled to a liberal application.[11] 10 *Del. C.* § 6502 provides in pertinent part:

> Any person interested under a...written contract...may have determined any question of construction or validity arising under the...contract...and obtain a declaration of rights, status or other legal relations thereunder.[12]

Additionally, four elements are required to consider a controversy suitable for declaratory judgment: 1) the controversy must involve a claim of right or other legal interest of the party seeking declaratory relief; 2) the claim of right or other legal interest must be asserted against one who has an interest in contesting the claim; 3) the conflicting interests must be real and adverse; and 4) the issue must be ripe for judicial determination.[13]

Summary judgment is granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[14] If,

---

**9.** 10 *Del. C.* Ch. 65

**10.** *Hoechst Celanese Corp. v. National Union Fire Ins. Co.,* 623 A.2d 1133 (Del.Super.Ct.1992).

**11.** *Stabler v. Ramsay,* 89 A.2d 544 (Del.1952)..

**12.** 10 *Del. C.* § 6502.

**13.** *Rollins Int'l Inc. v. International Hydronics Corp.,* 303 A.2d 660, 662 (Del.1973).

**14.** Super. Ct. Civ. R. 56(c); *Burkhart v. Davies,* 602 A.2d 56 (Del.1991).

however, genuine issues of material fact exist, or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate.[15] The Court must view the facts in a light most favorable to the non-moving party.[16]

Where there is ambiguity in an insurance policy, that ambiguity must be resolved in favor of the insured and against the insurer that drafted the policy.[17] If the language is clear and unambiguous, "a Delaware court will not destroy or twist the words under the guise of construing them." [18] A contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.[19] A court reviewing an insurance policy for ambiguity must examine all relevant portions of the policy, rather than reading a single passage in isolation.[20]

## DISCUSSION

### A. Introduction

The question before the Court is whether the conditions specified in the Koffler report potentially satisfy the "Additional Coverage for Collapse" provisions resulting in coverage for Plaintiffs under the Policy. The term "collapse" is not defined in the policy itself, so the issue is whether the conditions described constitute "collapse" as a matter of law. There is little Delaware precedent directly on point, and there is a division of authority among the jurisdictions that have considered the question (including New Jersey and Pennsylvania, as explained below). The Court now holds that, subject to sufficient proof at trial that "hidden decay" caused the building's condition, Plaintiffs shall be compensated by Selective if the Property is in a state of serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the Property.

Resolution of what constitutes a "collapse" under property insurance contracts has been said generally to turn on two "overriding" considerations.[21] The first consideration is "the form of the clause," i.e., the particular policy language and the extent to which "collapse" is defined.[22] The second consideration is "the general view adopted by the [jurisdiction]...as to how the term 'collapse,' as used in the policy, is to be defined." [23]

One authority has observed that "[u]ltimately, qualified professionals will have to make [a "judgment" as to whether a collapse has occurred] on a case-by-case basis after a thorough review of the building and damage involved. If the experts cannot agree, a judge or jury may have the final say as to what is or is not a collapse." [24]

**15.** *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962).

**16.** *Merrill v. Crothall–American, Inc.*, 606 A.2d 96, 99–100 (Del.1992).

**17.** *Steigler v. Insurance Co. of N. Am.*, 384 A.2d 398, 400 (Del.1978).

**18.** *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del.1982).

**19.** *Id.*

**20.** *Cheseroni v. Nationwide Mut. Ins. Co.*, 402 A.2d 1215, 1217 (Del.Super.Ct.1979), *aff'd*, 410 A.2d 1015 (Del.1980).

**21.** Annotation, *What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy*, 71 A.L.R.3d 1072, 1075 (1976).

**22.** *Id.*

**23.** *Id.*

**24.** Paula B. Tarr et al., *Insurance Coverage for Collapse Claims: Evolving Standards and Legal Theories*, 35 Tort & Ins. L.J. 57, 72 (1999).

Another authority states that "[w]hile the term 'collapse'...[is] deemed unambiguous by some courts, it is seen as ambiguous by others, creating a question of fact as to whether particular events constitute a collapse."[25] "A 'collapse' may be established even absent an actual falling down of the building, as when a municipality determines that the building is unsafe."[26] Determining what constitutes a collapse is "largely [a question] of degree."[27]

The Court will first conduct an analysis of other jurisdictions' approaches before discussing the actual policy language at issue here.

### B. The "Traditional View" Versus the "Broad View" of the Meaning of "Collapse" in Property Insurance Contracts

There are two lines of cases in the United States interpreting "collapse" in property insurance contracts. The approaches of courts on this issue have been succinctly summarized by a secondary authority:

> Courts in the various jurisdictions have taken one of two general approaches in determining what constitutes a collapse. The most longstanding view is that collapse is a plain and unambiguous term susceptible of only a single meaning: "the sudden falling-in, loss of shape, or flattening into a mass of rubble" of a building. [citations omitted] While courts taking this view do not always require that a building fall completely to the ground, they generally require a great deal of damage before

collapse coverage will be triggered. [citations omitted]

> In contrast, some courts have found collapse to be ambiguous. Acknowledging that the traditional definition is one valid interpretation of the word, these courts nevertheless have expanded the definition to include "substantial impairment of the structural integrity" of a building. [citations omitted] Upon a finding that two reasonable constructions of the word are available, these courts have adopted the broad meaning because that meaning typically is most favorable to the insured. [citations omitted]

> Unfortunately, the term structural integrity is not explicitly defined in the case law. A certain amount of disparity therefore exists among the "broad view" courts with respect to both the amount and type of damage necessary to trigger coverage. Some of these courts actually require caving or falling in before they will find a building's structural integrity to be impaired. [citations omitted] Others require only a danger of collapse, or, in a few cases, an attenuated possibility of collapse. [citations omitted] Additionally, they may or may not require that the damage occur or be likely to occur "suddenly." [citations omitted][28]

In 1996, a federal district court applying Utah law observed that "[i]t appears that the clear modern trend is to hold that collapse coverage provisions...which define collapse as not including cracking and settling [] provide coverage if there is substantial impairment of the structural integrity of the building or any part of a

---

**25.** 10 Lee R. Russ et al., *Couch on Insurance* ¶ 148:54, at 94 (3d ed.1998).

**26.** *Id.*

**27.** *Id.* ¶ 148:55, at 96.

**28.** Alan R. Miller et al., *What Constitutes a Collapse Under a Property Insurance Policy*, 29–WTR Brief 20, 21 (2000) (the Winter 2000 issue of "The Brief", a quarterly publication of the Tort and Insurance Practice Section of the American Bar Association).

building."[29] The Illinois Appellate Court stated in a 1998 opinion that "it is clear that under the majority view the term 'collapse' does not require complete destruction or falling in of the building or a part thereof...."[30] And the Supreme Court of Connecticut commented in 1987 that "the cases...which hold that 'collapse' unmistakably connotes a sudden falling in, loss of shape, or flattening into a mass of rubble, have come to be in the distinct minority."[31]

Interestingly, appellate courts in two states adjacent to Delaware have recently ruled on the definition of "collapse" in the property insurance context, each reaching different results. A recent decision by the Superior Court of Pennsylvania explains that Pennsylvania is a "traditional view" jurisdiction.[32] Contrastingly, a subsequent decision by the New Jersey Superior Court Appellate Division shows that New Jersey (and New York as well) is a "broad view" state.[33]

## C. This Court Adopts a "Broad View" Approach

■ This Court again declines to embrace the "traditional view" that a building must be reduced to rubble or flattened form before coverage is triggered.[34] As the court in *Doheny West Homeowner's Ass'n v. American Guar. & Liability Ins. Co.*[35] stated, to require an insured to neglect the insured property until it fell would be "a course of action which could not possible comport with the expectation and intent of the insured, or advance the best interests of the insured, the public, or even the insurer...."[36] The *Doheny West* court therefore required that a "collapse" of a building be either "actual" or "imminent," *i.e.*, "likely to happen without delay; impending, threatening or likely to occur at any moment," before coverage

29. *American Concept Ins. Co. v. Jones,* 935 F.Supp. 1220, 1227 (D.Utah 1996) (denying insurer's motion for summary judgment because factual issue existed with regard to sewer line leakage causing substantial impairment to home's structural integrity and because "collapse" provision defined term only by expressly not including and cracking).

30. *Indiana Ins. Co. v. Liaskos,* 297 Ill.App.3d 569, 231 Ill.Dec. 844, 697 N.E.2d 398, 404 (1998) (holding that "collapse" meant a substantial impairment to the structural integrity of a building and not a complete destruction or sudden catastrophic occurrence of insured property).

31. *Beach v. Middlesex Mut. Assurance Co.,* 205 Conn. 246, 532 A.2d 1297, 1300 (1987) (holding that homeowner policy excluding coverage for damages arising from 'settling, cracking, shrinkage, bulging or expansion' did not unambiguously limit its liability to collapse of sudden and catastrophic nature).

32. *See Dominick v. Statesman Ins. Co.,* 692 A.2d 188 (Pa.Super.Ct.1997), *appeal denied,* 555 Pa. 701, 723 A.2d 671 (Pa.1998) (holding that structure must "fall together" or "fall in" to constitute "collapse" within insurance policy).

33. *See Fantis Foods, Inc. v. North River Ins. Co.,* 332 N.J.Super. 250, 753 A.2d 176 (2000), *cert. denied,* 165 N.J. 677, 762 A.2d 658 (2000) (holding that, under New York or New Jersey law, "collapse" means "any serious impairment of structural integrity that connotes imminent collapse threatening preservation of the building as a structure or the health and safety of occupants and passers-by").

34. *Judge v. State Farm Ins. Cos., Del.Super.,* C.A. No. 92C–03–010, 1993 WL 1611307 Graves, J. (May 3, 1993) *(Letter Op.)*

35. 60 Cal.App.4th 400, 70 Cal.Rptr.2d 260 (1997) (collecting cases and stating that those courts adopting a "broad view" have "either implicitly or explicitly require[d] that collapse be imminent and inevitable, or all but inevitable").

36. *Doheny West* at 264.

would be available.[37]

*Fantis Foods, Inc., v. North River Ins. Co.*[38] is a recent New Jersey "broad view" decision formulating a rule that this Court finds reasonable insofar as the expectations of insurers and insureds are concerned. In that case, an insured with a principal place of business in New Jersey sought a declaratory judgment that property it owned in New York was covered under an "Additional Coverage—Collapse" form in a situation where the building was in danger of "imminent collapse". After determining that New York decisional law had moved away from the "traditional view" espoused by such earlier cases as *Weiss v. Home Ins. Co.*, 9 A.D.2d 598, 189 N.Y.S.2d 355 (1959)[39], the *Fantis Foods* court announced that it would adhere to the "majority view" and stated that:

> Under [New Jersey] law, the collapse peril insured against does not require that structures fall; rather, without any narrowing internal definition, such a policy must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by.[40]

Because the Court finds the "broad view" more in line with the presumptive concerns of both insurers and insureds, but is wary of impermissibly extending the coverage of the Policy, it finds the *Fantis Foods* approach persuasive. Accordingly, the Court adopts the *Fantis Foods* standard (but with slight modification) and holds that "collapse" in a property insurance policy covers "any serious impairment of structural integrity that connotes immi-

nent collapse threatening the preservation of the insured property."

This Court's definition of the term "collapse" in this case is not inconsistent with the definition in the *Judge* decision. The *Judge* Court followed the "majority" rule, noting that "collapse" could include a state. of "imminent collapse" partly because "[i]f the insurer had intended that the provision be so severely limited as to include only those situations involving a sudden falling of a structure, [it] could have drafted the contract to read that way."[41] That reasoning is still sound, but this Court has in this case defined "collapse" as meaning "any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the insured property," in light of "majority" or "broad view" cases decided subsequent to *Judge*.

## D. The Policy Definition of "Collapse" is Ambiguous

■ It is unclear what the Policy means by denoting "collapse" as a coverage-triggering event. The Policy includes a "special form" for certain causes of loss, including "collapse." Collapse is undefined except within the context of an "Additional Coverage for Collapse" clause. That clause provides that Selective will pay for "direct physical loss or damage caused by collapse," if the collapse is caused by an enumerated peril such as "hidden decay." The term "collapse" in turn is defined only as not including "settling, cracking, shrinkage, bulging or expansion." Thus the Court must proceed further because the language contained in the policy is ambiguous.

37. *Id.*

38. 332 N.J.Super. 250, 753 A.2d 176 (2000).

39. Selective relies on this case when it asks this Court to adopt the "traditional view".

40. *Fantis Foods,* 753 A.2d at 183.

41. *Judge* at 6.

■ Delaware courts have held that in order for ambiguity to exist, two conflicting interpretations, each reflecting a reasonable interpretation of the contractual language, must be shown;[42] in making a determination of the reasonableness of two differing interpretations, the Court must examine all relevant portions of the policy as a whole.[43]

The Policy provides for coverage under a section entitled "Additional Coverage for Collapse." Thus, a party contemplating purchasing the subject contract would reasonably expect there to be some form of coverage for a "collapse" of the insured premises, or else the party would presumably seek another form of insurance policy. At the same time, that section excludes things such as "settling" and "cracking." The intent of this section is presumably to limit an insurer's possible liability to only those claims that could legitimately be made pursuant to a claimed "collapse" of the building.

The Court finds that there are two reasonable interpretations that could be made concerning the language of this policy, each represented by the respective contentions of the parties. Plaintiffs could not reasonably have expected the Policy to cover mere impairment of structural integrity—a concern that mirrors Selective's legitimate unease with potentially having the Policy converted into a "maintenance agreement." At the same time, it would be illogical to force the Plaintiffs to wait for the actual falling down of the Property before they could make a claim against Selective.

Under this analysis, the Court finds that there is more than one reasonable interpretation of the subject policy, and that the policy is therefore ambiguous. The Court's finding requires that the reasonable expectations of the insured be upheld, and that coverage may exist under the policy, if Plaintiffs can satisfy the trier of fact at trial that there exists "any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the insured property." Selective is not entitled to summary judgment as a matter of law.[44]

### E. Recovery of Plaintiffs' Pre-"Collapse" Expenditures

■ Plaintiffs argue that the Delaware Supreme Court's decision in *United Services Auto. Ass'n Properties Fund, Inc. v. Burns*[45] entitles them to recover for work done before an actual "collapse" if Plaintiffs can establish 'hidden decay' which would result in eventual collapse.

---

42. *Hallowell*, 443 A.2d at 926.

43. *Cheseroni*, 402 A.2d at 1217.

44. The Court notes that the Insurance Services Office (ISO), a supplier of statistical, actuarial and underwriting information, has apparently revised its recommended language of collapse coverage provisions to now read as follows:
   Additional Coverages
   8.
   a.   With respect to Additional Coverage:
   (1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building cannot be occupied for its intended purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
   . . . .
(4) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.
   Alan R. Miller et al., *What Constitutes a Collapse Under a Property Insurance Policy*, 29–WTR Brief 20, 24 (2000).

45.   640 A.2d 655 (Del.1994).

The insurance policy in *Burns* covered "collapse due to 'hidden decay,'" but did not define "hidden decay."[46] The court, however, found coverage for the "actual collapse" of the basement of the insured house (which had been constructed over a "debris pit" containing vegetative matter that had decomposed), and awarded the insureds, among other things, the cost of repairs they had made before the collapse.[47] The court did so because it found the term "hidden decay" ambiguous, and because of "the uncontradicted testimony of [the insured]...that she expected from the day of the collapse that the loss would be covered under the policy...."[48]

Once the *Burns* court determined there had been a "collapse" within the scope of the policy at issue, *i.e.*, an "actual" collapse, the repairs that plaintiffs had made in an effort to mitigate their damages were recoverable. Such a recovery is entirely reasonable given that one of the purposes of the policy at issue was to compensate plaintiffs for loss due to collapse, and that plaintiffs were only trying to minimize a loss that was within the scope of the policy. If it is determined at trial that Plaintiffs here had in effect minimized a loss within the scope of the subject Policy, then *Burns* would dictate that Plaintiffs be compensated for those repairs.

**F. A Declaratory Judgment Now Issues that Plaintiffs May Recover for any "Collapse" if Plaintiffs Can Prove "Any Serious Impairment of Structural Integrity That Connotes Imminent Collapse Threatening the Preservation of the Property"**

Given the Court's decision that summary judgment in favor of Selective is not ap-propriate because it is not entitled to judgment as a matter of law, the Court finds that a declaratory judgment that Plaintiffs are entitled to coverage under the Policy is appropriate. The Court's ruling is subject to Plaintiffs introducing at trial facts sufficiently showing that the Property is in a state of serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the Property, and that that state was caused by hidden decay.

A declaratory judgment shall issue because the four necessary elements of declaratory judgment are satisfied.[49] Plaintiffs have made a claim based on the express language of the Policy, and Selective has contested the validity of that claim. This conflict is real and adverse because a resolution will necessarily determine the rights and obligations of the parties. The issue is ripe because there are sufficient facts before the Court to enable an analysis of the contractual language in issue. Therefore a declaration that coverage exists under the policy subject to proper facts being shown at trial is appropriate. The Court notes that if the finder of fact determines that a "collapse" has occurred and that such a collapse was caused by hidden decay (thus triggering coverage under the Policy), the Plaintiffs are entitled to any pre-collapse expenditures they may have made in an effort to reduce their damages.

**CONCLUSION**

Accordingly, Selective's motion for summary judgment is **DENIED** and a declara-

46. *Id.*

47. *Id.*

48. *Id.*

49. *Rollins,* 303 A.2d at 662.

tory judgment is **ISSUED** as herein stated.

IT IS SO ORDERED.